**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CLIDY M. DAVIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO 04-0678-D** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**ORDER**</u>

Plaintiff brings this action under 42 U.S.C. § 405(g) and 1383(g) seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income, Social Security disability insurance benefits and a period of disability.  The parties waived their right to proceed before a United States District Judge and consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in connection with this action. (Doc. 17).  This action was referred to the undersigned by United States District Judge William H. Steele to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Doc. 18).  Oral argument was waived and the matter was taken under submission on the pleadings. (Doc. 22).  Upon consideration of the administrative record, and the memoranda of the parties, the decision of the Commissioner is **affirmed.**

**I.**     <u>**Issues on Appeal**</u>

1.  Whether the Administrative Law Judge (ALJ) erred in finding plaintiff can perform the full range of medium work on a sustained basis.

2. Whether the ALJ erred in finding that plaintiff's depression is not a severe impairment.

3.  Whether the ALJ erred in failing to properly consider plaintiff's testimony of chest pain, shortness of breath, dizziness, and fatigue.

4. Whether the ALJ erred in failing to find that plaintiff suffers from the severe impairment of obesity.

## II.    Background Facts

Plaintiff was born on June 8, 1954 and was forty-nine years old at the time of the administrative hearing on December 10, 2003. (Tr. 28).  She is a high school graduate with past relevant work as certified home health aide. (Tr. 30-31, 292, 297).  Plaintiff alleges that she is unable to work because of hypertension, heart condition, depression, thyroid condition, and nerves. (Tr. 85, 291).  Plaintiff alleges that these impairments cause shortness of breath, blurry vision, headaches, constant fatigue, dizziness, an enlarged heart, and a slow heart rate. (Tr. 85, 291).  Plaintiff initially alleged that she became unable to work on July 16, 2001; however, the adjudication of her prior applications amended her onset date to June 21, 2002.[1]

## III.    Procedural History

In November 2001, plaintiff initially applied for supplemental security income and disability insurance benefits alleging an onset date of July 16, 2001. (Tr. 70-73).  The applications were denied initially. (Tr. 47-53).[2]  An administrative hearing was held before the ALJ and on June 21, 2002, the ALJ entered a decision wherein he found plaintiff not disabled.

[1] The Government points out that plaintiff's prior application resulted in an unfavorable decision dated June 21, 2002, which the ALJ did not reopen. (Doc.16, n.1).  Plaintiff has not challenged the ALJ's decision not to reopen the prior ALJ's decision. (Doc. 11).

[2] The reconsideration stage was eliminated from this case pursuant to a test of modifications to the disability determination. 20 C.F.R. §§ 404.906, 404.966, 416.1406 and 416.1466.

(Tr. 237-251).  Plaintiff did not request further review of the ALJ's decision.

On November 6, 2002, plaintiff again applied for supplemental security income and disability insurance benefits, with a protective filing date of October 29, 2002. (Tr. 435-437, 275-278).  Her applications were denied. (Tr. 440-444, 252-258).[3]  On December 10, 2003, a hearing was held before the ALJ and plaintiff and her attorney were present. (Tr. 25-46).  On July 30, 2004, the ALJ entered a decision wherein he found the plaintiff not disabled. (Tr. 13-21).  On September 10, 2004, the Appeals Council denied plaintiff's request for review and the hearing decision became the final decision of the Commissioner of Social Security. (Tr. 4-6).

## IV.   **Findings of the Administrative Law Judge**

The ALJ found plaintiff has the severe impairments of hypertension and hyperthyroidism but that these impairments did not meet or medically equal a listing in the Listing of Impairments. 20 C.F.R.  Pt. 404, Subpt. P, App. 1. (Tr. 20).  The ALJ found plaintiff has the residual functional capacity to perform the full range of medium exertional work and that her hypertension and hyperthyroidism do not prevent claimant from performing her past relevant work. (Tr. 20-21).  The ALJ found plaintiff's allegations regarding her limitations were not credible. (Tr. 20).  The ALJ found plaintiff could return to her past relevant work as a nurse's aide and thus, was not disabled as defined in the Social Security Act. (Tr. 21).

## V.   **Plaintiff's Testimony**

At the hearing, plaintiff testified as follows:

Plaintiff was forty-nine years old, 5'4" tall and weighed 230 pounds. (Tr. 38).  She

---

[3] The reconsideration stage was eliminated from this case pursuant to a test of modifications to the disability determination. 20 C.F.R. §§ 404.906, 404.966, 416.1406 and 416.1466.

allowed her driver's license to expire because she did not "have anything to drive." (Tr. 29).  She is divorced with four children.  Her youngest child is eighteen, in college, and no longer lives with her. (Tr. 30).  She can read, write and handle her own finances. (Tr. 31-33).

Plaintiff stopped working as a home health aide in 1998 because the agency did not have enough work to offset the expense of working (gas, etc.). (Tr. 33-34).  She became ill in July 2000. (Tr. 34).  She supports herself on $300.00 per month child support and $102.00 of food stamps. (Tr. 35).  She contacted Vocational Rehabilitation but after answering some questions, she was told by phone that they could not help her. (Tr. 36).

Plaintiff spends most of each day lying down. (Tr. 39).  Her sister brings groceries twice a week. (Tr. 40).  Plaintiff makes soup or sandwiches for meals but is not "a big eater." (Tr. 40).  She cleans her own house but it does not get real dirty because she lives alone. (Tr. 41).  She goes to church about twice a month. (Tr. 41).

Plaintiff staggers a lot and when she holds her head down she feels as if she will fall. (Tr. 37).  Tiredness and weakness prevent her from working. (Tr. 38-39).  She gets tired when she walks and usually gasps for breath. (Tr. 45).  She sometimes uses an inhaler. (Tr. 45).  She takes medication for blood pressure and thyroid. (Tr. 41).  For the past two years, the floaters in her eyes have worsened. (Tr. 37).  Her eye doctor prescribed reading glasses which she uses. (Tr. 38). She has problems with her legs and back. (Tr. 45).

Plaintiff's hands have bad circulation and must be put in hot water to restore feeling. (Tr. 42).  She can no longer afford treatment because she lost Medicaid when her daughter reached eighteen. (Tr. 41-42).  Her hands are numb and her wrists hurt. (Tr. 42-43).  She was scheduled for carpal tunnel surgery several years ago but could not go through with the surgery. (Tr. 43).

Her doctor gave her wrist splints which she wears at night and sometimes in the day. (Tr. 43).
The splints help some but she has bad spells of no feeling in her hands. (Tr. 43).

Plaintiff was taking Paxil for her nerves but has not been able to afford it since she lost
her Medicaid. (Tr. 44).  She shakes, sweats and has bad dreams but the medication calms her.
(Tr. 44).  Her nerves affect her ability to work because she cries "mostly everyday" for ten or
fifteen minutes or more. (Tr. 44).  If she is stressed she will wake up and start crying. (Tr. 44).

## VI.   Analysis

### A.   Standard of Review.

In reviewing claims brought under the Act, this court's role is a limited one.  The court
may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the
Commissioner.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's
findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan,
921 F.2d 1233, 1235 (11th Cir. 1991) (citing Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th
Cir. 1983)).  Substantial evidence is defined as "more than a scintilla but less than a
preponderance," and consists of "such relevant evidence as a reasonable person would accept as
adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 390, 401, 91 S.Ct. 1420,
1427 (1971); Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1158-1159 (11th Cir.
2004); Bloodsworth, 703 F. 2d at 1239.  The Commissioner's decision must be affirmed if it is
supported by substantial evidence even when a court finds that the preponderance of the
evidence is against the decision of the Commissioner. Richardson, 402 U.S. at 401, 91 S.Ct. at
1427 (1971); Crawford, 363 F. 3d at 1158-1159; Bloodsworth, 703 F.2d at 1239.   "In
determining whether substantial evidence exists, we must view the record as a whole, taking into

account evidence favorable as well as unfavorable to the [Commissioner's] decision." Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). Further, it has been held that the Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991). This court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

**B.      Statement of the Law**

An individual who applies for Social Security disability benefits or supplemental security income must prove their disability. See 20 C.F.R. § 404.1512; 20 C.F.R. § 416.912. Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven their disability. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. At the first step, the claimant must prove that he or she has not engaged in substantial gainful activity. At the second step, the claimant must prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). In

evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history.  Id. at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity and age, education, and work history.  Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); see also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

### C.   **Medical Evidence**

On February 1, 2000, plaintiff was treated at the emergency room for a sharp pain in her eye and black spots in her vision.  She was diagnosed with malignant hypertension and medications were prescribed. (Tr. 124-126).

On May 3, 2000, plaintiff was treated at Jackson Medical Center by a nurse for shortness of breath, vomiting and staggering for the past three or four months.  She also reported that she had not taken one of her hypertension medications for "over a month".  She was diagnosed with uncontrolled hypertension, gastritis, tension, anxiety, and depression for which medications were prescribed.  Her weight was noted at 236 pounds. (Tr. 223).  Plaintiff returned May 22, 2000 for a blood pressure check and reported taking her blood pressure medications as directed.  Her blood pressure readings were normal. (Tr. 222).

On February 16, 2001, plaintiff returned to the Center with complaints of fatigue for the past three or four months and chest pain three times a day.  She reported that she did not take blood pressure medications and that she had ran out of medications.  She was diagnosed with hypertension and medications were administered. (Tr. 218).  Plaintiff returned on February 23, 2001, for a blood pressure check. (Tr. 217).

On June 8, 2001, an echocardiogram showed a "trace mitral regurgitation" and "mildly dilated left atrium" but was otherwise normal. (Tr. 128).

Plaintiff was treated by A. Garrett Miller, M.D., on July 31, 2001 for chest pain, nausea and headache (Tr. 160) and on August 14, 2001 for spots and blurred vision, (Tr. 159).  On August 21, 2001, she was treated at Grove Hill Hospital for chest pains, vomiting and weakness. (Tr. 128-151).  Dr. Miller diagnosed "atypical chest pain most likely musculoskeletal, fatigue, dyspnea, hypertension, microcytic anemia, and a family history of atherosclerosis." (Tr. 129). Her echocardiogram, carotid doppler studies and abdominal ultrasound were normal. (Tr. 131, 133, 139,140, 141).  The upper gastrointestinal study showed a "small sliding type of hiatal hernia with small amount of reflux." (Tr. 142).  At discharge, on August 24, 2001, Dr. Miller noted that the cardiologist had increased plaintiff's blood pressure medication and that she needed a thyroid scan. (Tr. 129).

On September 20, 2001, plaintiff reported to Jackson Medical Center with complaints of left hip pain extending to her leg, coughing, spots in her vision field, and hot flashes.  No medical notes were entered. (Tr. 216).

On September 25 and 26, 2001 plaintiff returned to Dr. Miller and was treated for a stomach bacteria (H. Pylori) (Tr. 156-158), and on October 3 and 4, 2001, plaintiff was treated

for pneumonia. (Tr. 154-155).  Plaintiff's weight was 200½ pounds. (Tr. 154).  On October 3,

2001, plaintiff's abdominal ultrasound was interpreted as normal (Tr. 165) and her chest x-ray

indicated cardiomegaly (an enlarged heart) and "mild congestive failure." (Tr. 164).

On November 26, 2001, plaintiff was initially seen by Karen Manning, M.D. (Tr. 171-

172).  Dr. Manning noted her impressions of fatigue, breast mass, chest pain, shortness of breath,

hypertension, and iron deficiency anemia and ordered additional testing. (Tr. 172).  On

examination, she noted 2+ pitting edema in the legs with some calf tightness and tenderness.

She also noted "a little bradycardia but regular rate and rhythm" upon examination of plaintiff's

heart. (Tr. 171).  She noted plaintiff's report of a recent weight loss of 50 pounds in six months,

heat intolerance, thirst, chest pain, and shortness of breath. (Tr. 171).  Dr. Manning's laboratory

tests indicated thyroid disease. (Tr. 175-176, 179).

On November 28, 2001, plaintiff was seen by M. Hashimi, M.D., a cardiologist, on

referral from Dr. Manning.  The examination notes are mostly illegible.  Plaintiff appears to

report feeling tired and weak since July; difficulty breathing with minimal exertion, especially at

night; sleeping in a chair; swollen feet; incidents of fever, nausea and vomiting; and that she was

told she has an enlarged heart, anemia, and overactive thyroid.  Her weight was reported at 194

pounds and her blood pressure was 138/68 and 142/70.  Dr. Hashimi sent plaintiff for diagnostic

studies. (Tr. 342).

On November 30, 2001, plaintiff was admitted to the hospital after reacting to IV contrast

injected for a CT scan ordered by Dr. Hashima. (Tr. 342, 189).  Kenneth Francez, a cardiologist

and associate of Dr. Hashimi, noted a discharge diagnosis of contrast reaction, dyspnea with

exertion, uncontrolled hypertension, and hyperthyroidism for which he referred plaintiff to Anita

Kemmerly, M.D. (Tr. 189).  Dr. Kemmerly noted her assessment of "primary hyperthyroidism" and that she felt "most of [plaintiff's] symptoms are currently related to her thyroid disease." (Tr. 192).  On November 30, 2001, plaintiff's pulmonary function test showed "mild restrictive pulmonary defect with mild reduction in diffusion capacity." (Tr. 325).  Also, on November 30, 2001, plaintiff was administered a cardiac test though part of the copy of the test results is not legible.  The radiologist noted "[m]arked cardiomegaly suggesting cardiomyopathy" and possibly "findings suggest anterior mediastinal mass" but the remainder of his impression is not legible. (Tr. 326).  Also, plaintiff's chest CT scan showed no evidence of pulmonary embolus but did show lymphadenopathy and some abnormalities in the lung suggestive of sarcoidosis but lymphoma or other malignancy could not be ruled out.  On December 3, 2001, plaintiff underwent a renal ultrasound which was normal. (Tr. 324).

On January 22, 2002, plaintiff returned to the Center with complaints of a breast mass and reported her diagnosis and treatment for hyperthyroidism. (Tr. 215). On February 18, 2002, plaintiff returned with complaints of a sore throat and shortness of breath for one week.  Additional testing was ordered.  She reported seeing a doctor for the breast mass. (Tr. 213).

On March 1, 2002, plaintiff returned to the Center and reported a cold, pain in her left leg from her ankle to her thigh, and palpations at night.  She also expressed concern about weight loss and skin discoloration. She was referred to Dr. Kemmerly. (Tr. 211).

On March 1, 2002, plaintiff returned to Dr. Kemmerly and reported feeling very tired and not resting properly for a week.  She also reported heart flutters, hair loss, skin color change, and weight loss. (Tr. 207).  While discussing treatment options including radiation therapy for the thyroid enlargement, plaintiff reported that "[s]he has a small grandchild she takes care of at

10

home and cannot be away from the child for a week." (Tr. 208).  Dr. Kemmerly diagnosed

"probable Graves' disease," hyperthyroidism, hypertension, and adjusted the dosage of

plaintiff's medications. (Tr. 207, 339-340).

On March 8, 2002, plaintiff returned to the Center and reported right shoulder and left leg

pain.  She also reported bad nerves and difficulty sleeping.  She was diagnosed with shoulder

pain, insomnia, menopause, hypertension, and hyperthyroidism.  Medications were prescribed

and she was referred back to Dr. Kemmerly. (Tr. 212).

On March 29, 2002, plaintiff returned to Dr. Kemmerly.  Her weight was reported at 202

pounds.  Dr. Kemmerly noted plaintiff's symptoms had not changed much and that plaintiff

asked for something for nervousness.  She adjusted plaintiff's medications and added Paxil, an

anti-depressant.  Dr. Kemmerly also noted that the anxiety was probably due to the

hyperthyroidism. (Tr. 337).  She noted that if plaintiff did not respond to the change in

medication, then she would arrange for radiation therapy. (Tr. 338).

On April 10, 2002, plaintiff's thyroid was treated with radiation therapy.  She began

taking Synthroid, a thyroid medication in June 2002. (Tr. 333).

On April 17, 2002, plaintiff saw Robert Edge, M.D., an ophthalmologist.  Following an

eye examination, he prescribed bi-focal glasses.  He noted he would not prescribe treatment

because plaintiff's problems should resolve as her thyroid resolved. (Tr. 422).

On May 8, 2002, plaintiff returned to Dr. Kemmerly with reports of feeling tired,

nervous, and sweaty, and that her heart was racing.  Her weight was reported at 198 pounds and

her blood pressure was 150/94.  Dr. Kemmerly adjusted plaintiff's medication and ordered

thyroid tests. (Tr. 336).

11

On June 17, 2002, plaintiff returned to Dr. Kemmerly with reports of headache, dizziness,  fatigue, and feeling "hot, nervous, and sweaty".  Plaintiff's weight was 205 pounds and her blood pressure was 160/100.  She adjusted plaintiff's medications and ordered thyroid tests. (Tr. 335).

On July 12, 2002, plaintiff was treated by a nurse practitioner in the office of Jared Ellis, M.D., for hypertension and hyperthyroidism.  The nurse noted plaintiff was "asymptomatic w/o headache, chest pain, SOB or other symptoms." (Tr. 330).

On August 14, 2002, plaintiff returned to Dr. Kemmerly and her weight had increased to 216 pounds.  Plaintiff reported some symptoms of hyperthyroidism and her medication was adjusted. (Tr. 334).

On September 20, 2002, plaintiff returned to Dr. Ellis with reports of shortness of breath for the past few days, leg and back pain.  Plaintiff's weight was 222 pounds.  Her chest x-ray showed "overall cardiomegaly" and her EKG showed other cardiac symptoms.  Plaintiff was referred to Dr. Kemmerly for additional testing. (Tr. 329).

On October 9, 2002, plaintiff returned to Dr. Ellis with complaints of a cold with headache, sore throat, congestion, runny eyes, cough, and facial pressure.  Her weight was reported at 223 pounds.  Plaintiff denied shortness of breath or chest pain. She was diagnosed with sinusitis and medications were prescribed. (Tr. 328).

Plaintiff returned to Dr. Kemmerly on November 4, 2002, and her weight was recorded at 229 pounds.  She noted plaintiff had missed two weeks of thyroid medication thus tests could not be performed. (Tr. 333).  Dr. Kemmerly noted plaintiff reported still feeling tired and hair loss but reported improvement of her skin, "memory and concentration are okay", and "one episode

12

where she was having palpitations or some kind of problem and went to the emergency room."

(Tr. 333).   Her physical examination was normal and Dr. Kemmerly noted plaintiff's lungs were

clear and her heart was "regular with a mild systolic murmur." (Tr. 333).  The doctor assessed

"Graves' disease, status post I [131]" [radiation therapy], thyroid hormone replacement and

arthritis, and referred plaintiff to a pulmonary doctor. (Tr. 333).

On November 13, 2002, plaintiff was seen by William C. Gewin, M.D., on referral from

Dr. Kemmerly for difficulty breathing which was worse at night. (Tr. 331).  Dr. Gewin noted

plaintiff's history of thyroid disease and depression.  He reported her weight at 230 pounds.  He

also noted that she had an "extensive [cardiac] workup and apparently nothing was found from a

cardiac standpoint."(Tr. 331).  Dr. Gewin found plaintiff's lungs were clear but that spirometry

revealed "a mild reduction in forced vital capacity, but no airways obstruction." (Tr. 332).  Dr.

Gewin also found as follows:

> I have viewed her chest x-ray.  I discussed the situation with her.  I think a lot of
> her shortness of breath is probably related to her weight.  She did not have any
> evidence of airways obstruction, but this may be because asthma tends to be
> intermittent.  I will treat her aggressively for asthma with Singulair, Advair and
> Albuterol. I will have her return to see me in three weeks.  If she continues to
> have problems, I will refer her for complete pulmonary functions at the Mobile
> Infirmary.

(Tr. 332).

On December 11, 2002, plaintiff was treated at Family Medical of Jackson, P.C., by Sid

Crosby, M.D.  She complained of lower back pain, chest pain, dizziness, intermittent numbness

in her hands, and cold symptoms.  Plaintiff was referred to a cardiologist and medications were

prescribed for cold, reflux, and back pain in addition to her medications for hypertension,

depression and thyroid.  Dr. Crosby reviewed plaintiff's current list of medications with her,

prescribed additional medication for back pain, and advised plaintiff to elevate the head of her

bed and not eat late. (Tr. 417).

On December 19, 2002, plaintiff returned to Cardiology Associates with complaints of

shortness of breath and fatigue.  Her weight was recorded as 244 pounds and her blood pressure

was 180/80.  The doctor's notes are mostly illegible but it appears that she was scheduled for

additional testing one of which was an echocardiogram and pulmonary consult. (Tr. 341).

On December 26, 2002, plaintiff's echocardiogram was interpreted as follows:

1. Normal left ventricular size and function with a left ventricular ejection
fraction of approximately 55% with an area of possible hypokinesis of the inferior
wall. Clinical correlation is recommended.
2. Mild biatrial enlargement.
3. Mild to moderate mitral regurgitation.
4. Trace tricuspid regurgitation with a normal estimated RV systolic pressure of
20 mm. of mercury.

(Tr. 352).  Plaintiff's cardiolite stress test was interpreted as follows:

1. Left ventricular ejection fraction of 67% - - excellent wall motion.
2. No obvious reversible ischemia is noted.
3. Subtle anterior attenuation that is most likely due to breast artifact.

(Tr. 350).

On December 26, 2002, plaintiff was examined by William J. Shulte, M.D., a

pulmonologist.  Dr. Shulte noted plaintiff's report of difficulty breathing with any exertion and

that she cannot walk without becoming very short of breath.  He also noted that plaintiff "has

had a negative cardiac evaluation". (Tr. 343).  He noted her history of hypertension,

hyperthyroidism and obesity.  He also noted that plaintiff denied "chest pain when she is walking

and has had a negative stress test." (Tr. 343).   On physical examination Dr. Shulte noted

plaintiff's weight at 243 pounds.  He also noted plaintiff was obese and that she was alert and in

14

no distress.  He found her lungs were clear, heart was regular, and she had no cyanosis, clubbing

or edema in her extremities. (Tr. 343).  He also interpreted plaintiff's chest x-ray as

"unremarkable except for some mild cardiomegaly" and her pulmonary function tests as showing

"no obstruction, suggest restriction. Patient does not saturate with exercise." (Tr. 343).  Dr.

Shulte then noted as follows:

> I told Ms. Davis she needed to lose weight and begin exercising in order to regain
> her condition and also recheck with her cardiologist for hypertension.

(Tr. 344).

On March 7, 2003, plaintiff returned to Dr. Kemmerly.  She reported plaintiff's weight at

243 pounds.  Dr. Kemmerly noted plaintiff reported her energy was "okay" but her "memory is

poor" and she is "hot and cold."  Plaintiff complained of a sore throat and cough for two to three

weeks.  On examination, the doctor noted clear lungs and a regular heart rate but plaintiff's

tonsils were red, swollen and tender. (Tr. 391).  Dr. Kemmerly increased plaintiff's thyroid,

hypertension, and anti-depressant medications and prescribed medications for her cold. (Tr.

392).

On March 9, 2003, plaintiff returned to Dr. Kemmerly.  Her weight was reported at 241

pounds and her blood pressure was 148/80.  The doctor noted plaintiff was in for follow-up of

her thyroid and was "doing good". (Tr. 390).  Dr. Kemmerly noted

> She has a list of complaints today that is very long.
>
> 1. Sore throat.
> 2. Ear pain.
> 3. Nausea and vomiting occasionally.
> 4. Finger numbness.
> 5. Pain in her jaw.
> 6. Dizzy. The list goes on.

She pretty much has a completely positive review of systems for anything that you ask her."

(Tr. 390).  Plaintiff was assessed with Graves' disease, hypertension, arthritis, carpal tunnel syndrome, and an ear infection. (Tr. 390).

On May 12, 2003, plaintiff returned to Family Medical with complaints of back pain, seeing spots, reflux, nasal congestion, and carpal tunnel symptoms. (Tr. 403-409).  Plaintiff reported to Steve Furr, M.D. that Dr. Kemmerly thought she had carpal tunnel and plaintiff wanted wrist splints.  The doctor noted that plaintiff "has been unable to work with her multiple problems". (Tr. 405).  Her weight was reported at 243 pounds and her blood pressure was 150/80.  Dr. Furr continued plaintiff's medication and gave her wrist splints. (Tr. 409).

On May 13, 2003, John G. Yager, a neurologist, performed a nerve conduction study of plaintiff's hands to assess her carpal tunnel syndrome. (Tr. 404-402).  He noted his impression of a "normal study of all nerve segments tested." (Tr. 402).

On August 29, 2003, plaintiff returned to Family Medical was treated by Dr. Furr. He assessed plaintiff's reports of dizziness, hypothyroidism, floaters, carpal tunnel syndrome and back pain, prescribed medications, and referred her to Optometry. (Tr. 396-398).  On November 17, 2003, plaintiff returned to Dr. Furr.  No complaint was recorded. (Tr. 393).  Dr. Furr continued her medications. (Tr. 394).

E.      **Psychological examinations**

On January 23, 2003, plaintiff was consultatively examined by Nina E. Tocci, Ph.D., a psychologist.  Dr. Tocci noted plaintiff's report of weakness, headaches, dizzy spells and limited movement.  She also noted plaintiff's report of her medical history including treatment for depression with anti-depressant medication.  On mental status examination, Dr. Tocci found

16

plaintiff had a labile affect, depressed mood, normal attention and concentration, normal speech, "impairment in immediate memory and memory for recent medical events", cooperative attitude, average fund of information, good comprehension, intact ability to abstract, appropriate thought processes to mood and circumstance, logical thought organization, normal social judgment, and the "ability to make informed personal and financial decisions." (Tr. 357-358).  Dr. Tocci placed plaintiff in the average range of intellectual ability. (Tr. 358).

Dr. Tocci also noted plaintiff reported suicidal thoughts and feelings of failure "because of her life circumstances" and a hospitalization in 1994 following a suicide attempt.  Plaintiff also reported auditory and visual hallucinations of monsters and "trees and earth opening up and swallowing her" and that "she feels things crawling on her, cries often, eats one meal per day, experiences nightmares, night vision, and night sweats." (Tr. 358).  Plaintiff also reported gaining weight after taking Synthroid "but that her appetites is poor". (Tr. 358).

Plaintiff reported that her seventeen year old daughter lives with her but plaintiff is independent in activities of daily living but for bathing. (Tr. 356).  Plaintiff reported her daily activities consisted of reading and resting but her house is without heat and electricity because she has no money. (Tr. 358).  Plaintiff reported that she does not drive, have friends or attend church because she does not have the resources and does not fit. (Tr. 358).

Dr. Tocci found plaintiff was cooperative, motivated, and a credible informant. She diagnosed "major depression, recurrent, moderate" with a poor prognosis. (Tr. 358).  In summary, she found plaintiff was in "mild distress" and admitted to "experiencing several symptoms of depression."  She also found that "[a]lthough she appears to have the aptitude for participating in moderately difficult work tasks, she would have difficulty concentrating on tasks

for long periods and performing tasks in a timely and efficient manner." (Tr. 359).

On February 11, 2003, Ellen N. Eno, Ph.D., a non-examining agency psychologist reviewed plaintiff's medical records and noted the diagnosis of major depression. (Tr. 363, 372). Dr. Eno also rated plaintiff as mildly restricted in activities of daily living; moderately restricted in maintaining social functioning and maintaining concentration, persistence and pace; and would never experience episodes of decompensation. (Tr. 370). Dr. Eno also completed a mental functional capacity assessment wherein she found plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration; and interact appropriately with the general public. (Tr. 383-384). Dr. Eno found plaintiff was not significantly limited in all other areas. (Tr. 383-384).

On February 3, 2004, plaintiff was evaluated by Blaine C. Crum, Ph.D.. Dr. Crum noted plaintiff's report of her familial, educational, and medical history. He also noted her report of a suicide attempts in the early 1990's following a failed relationship and that currently she can not function because she "feels bad all day." (Tr. 425). Plaintiff reported suicidal thoughts and that she "feels that she is unnecessary to others and feels like giving up." (Tr. 425). She rated her depression as 8 on a scale of one to ten with ten. (Tr. 425). Dr. Crum noted plaintiff openly expressed herself but had a subdued and flatted affect. He found she became mildly tearful indicating emotions close to the surface but gave a account of herself and he felt this was a reasonable assessment of her current level of functioning. (Tr. 426). Dr. Crum administered the Mooney Problem Checklist, Beck Depression Inventory -II, and the Minnesota Multiphasic Personality Inventory - 2nd Edition. (Tr. 426-427). Dr. Crum diagnosed somatoform disorder with a secondary diagnosis of depression. In summary, he found as follows:

18

Clidy is struggling with a wide range of health problems that she has been unable to overcome.  She feels that she has been unable to work for quite some time due to fatigue, depression, and a general inability to sustain any form of employment.  Her psychological profile suggests somewhat of a preoccupation with a wide range of health problems that seem to dominate her overall focus.  She has significant depression also which likely impairs her ability to concentrate, focus, and manage day-to-day activities as well as any possible vocational tasks.  She feels very defeated and holds a very negative opinion of herself.  While she admits to suicidal thoughts and preoccupation she stops short of indicating any current active suicide intention.  She did note that in the early 1990's that she attempted suicide and was hospitalized for a period of time at Charter Hospital.  Psychologically, she has very low tolerance for stress and is very sensitive.  Her feelings are very easily hurt and she may harbor feelings that others don't give her proper attention and support.  This appears to be an imbedded behavior pattern and will be difficult to break out of this due to her substantial health difficulties and accompanying depression.  At this point it is perceived that she is unable to hold employment and she will need to stabilize her health as well as overcome the depression that has greatly affected her day-to-day functioning.

(Tr. 428).  Also, on February 3, 2004, Dr. Crum completed a mental residual functional capacity assessment wherein he found plaintiff was markedly limited in all mental basic work areas but for a moderate limitation in the ability to respond appropriately to co-workers and supervision.  (Tr. 387-388).  He found plaintiff's level of impairment had existed since 1999.  He diagnosed somatoform disorder and depression disorder and found that plaintiff had a poor prognosis "based on intertwined health problems and accompanying depression." (Tr. 388).

On April 29, 2004, plaintiff was consultatively examined by C.E. Smith, M.D., psychiatrist.  Dr. Smith noted plaintiff's report of her familial, educational, and medical history including her past admission for mental health treatment and denial of "any history of psychiatric treatment since then." (Tr. 429).  Plaintiff reported daily activities consisting of lying down most of the day, watching television, listening to the radio, and reading.  She also reported that her daughter does most of the house work and that "she doesn't do much cooking because she doesn't have much appetite." (Tr. 430).  Plaintiff also told Dr. Smith that she has shortness of

19

breath and no energy, her appetite was off, and her concentration and memory were uneven. Rating her mental status on a scale of 0 to 100 with 100 being the best, she reported a 0. (Tr. 430).  Plaintiff reported her disabilities as feeling tired all the time, having spots before her eyes, staggering a lot, pain in her hands, and a feeling of deadness in her hands and her right big toe. (Tr. 430-431).

On mental status examination, Dr. Smith noted plaintiff was alert, oriented, pleasant and made good contact, although "she was out of breath when she entered." (Tr. 430).  He also found plaintiff had normal speech, was relevant and coherent, exhibited no thinking disorder, and was euthymic with appropriate affect.  Dr. Smith noted plaintiff exhibited both tears and humor during the interview.  On cognitive testing, he found plaintiff was of low normal intelligence but he thought her effort was "somewhat suspect." (Tr. 430).  Dr. Smith found as follows:

> Ms. Davis suffers a number of medical problems for which she is treated. From the psychiatric point of view she presented well in that she was alert and personable and euthymic and in that she showed no indication of psychosis or organicity.  She understood and remembered and carried out even complex instructions and she appeared able to manage her own finances.  [Th]e only instance of psychiatric treatment was a brief hospitalization perhaps 15 years ago at the time her marriage was breaking up.  She is treated now by her primary physician with anti-depressant medication.

(Tr. 431).  Dr. Smith diagnosed an "adjustment disorder, chronic, relating to medical problems" and that "it is a toss up whether to offer adjustment disorder or no diagnosis.  In any event, Ms. Davis' psychiatric impairments are not grave." (Tr. 431).  Dr. Smith completed a medical source opinion form wherein he found plaintiff was either mildly impaired or had no impairment in all areas of basic mental work-related activities. (Tr. 432-433).

## E.     **Plaintiff's Argument**

**1.  Whether the Administrative Law Judge (ALJ) erred in finding plaintiff can perform the full range of medium work on a sustained basis.**

Plaintiff argues that hypertension and hyperthyroidism are non-exertional impairments. She also argues that because the ALJ found both to be severe impairments which, by definition, cause more than a slight or minimal functional limitation on basic work activities, the ALJ is precluded from finding that she has no non-exertional limitations which prevent her from performing the full range of work at any exertional level.  Thus, his decision that she could perform the full range of medium work is erroneous.  Plaintiff argues that hypertension and hyperthyroidism are non-exertional impairments "because they do not directly affect the ability to meet the seven strength requirements (sitting, standing, walking, lifting, carrying, pushing, and pulling.)" (Doc. 11, p. 6).  Plaintiff points out that the ALJ's residual functional capacity assessment was based solely on exertional findings and that he erroneously found she had "no other work related limitations", *i.e.*, no non-exertional limitations.  (Id.).

The ALJ found plaintiff has the residual functional capacity to

occasionally lift and carry up to 50 pounds and frequently up to 25 pounds. She can stand/walk for about six hours in an eight hour workday.  She can sit about six hours in an eight hour workday.  She has no other work related limitations. [(Tr. 374-382)].  Thus, the claimant can perform a full range of medium work activity on a sustained basis.

(Tr. 19).[4]

Plaintiff's argument is misplaced.  She has been diagnosed with the severe impairments of hypertension and hyperthyroidism.  However, a diagnosis is not the same as a functional

_____

[4] The ALJ relied upon the functional capacity assessment prepared by the non-examining agency physician on February 11, 2003 after review of plaintiff's medical records. (Tr. 374-382).

limitation and a medically diagnosed condition may result in either or both exertional and non-exertional functional limitations.  Social Security Ruling 96-4p: <u>Titles II and XVI: Symptoms, Medically Determinable Physical and Mental Impairments, and Exertional and Nonexertional Limitations</u>, 1996 WL 374187, sets forth as follows:

> 3. The terms "exertional" and "nonexertional" in the regulations describe types of functional limitations or restrictions resulting from a medically determinable physical or mental impairment; i.e., exertional limitations affect an individual's ability to meet the strength demands of jobs, and nonexertional limitations or restrictions affect an individual's ability to meet the nonstrength demands of jobs. Therefore, a symptom in itself is neither exertional nor nonexertional. Rather, it is the nature of the functional limitations or restrictions caused by an impairment-related symptom that determines whether the impact of the symptom is exertional, nonexertional, or both.

<u>Id.</u> at *1.  In other words, the "the medically determinable physical or mental impairment" is not inherently exertional or non-exertional, thus the symptom is not inherently exertional or non-exertional.

Additionally, plaintiff has not identified any specific non-exertional functional limitation which results from her severe impairments of hypertension and hyperthyroidism.  It appears plaintiff argues that because these are "non-exertional impairments" they, *ipso facto*, create non-exertional functional limitations which the ALJ's residual functional capacity assessment does not take into consideration.  The phrase "non-exertional limitation" covers an array[5] and, despite plaintiff's report of symptoms, this court will not speculate or attempt to ascertain plaintiff's specific non-exertional limitations from among the possibilities or adduce the evidence which supports her allegation.

---

[5] Non-exertional limitations are discussed in Social Security Ruling 96-4p: <u>Titles II and XVI: Symptoms, Medically Determinable Physical and Mental Impairments, and Exertional and Nonexertional Limitations</u>, 1996 WL 374187.

Plaintiff also argues that the ALJ failed to consider the non-exertional impairments of hypertension and hyperthyroidism when he found plaintiff could return to her past relevant work at step four of the sequential evaluation process but instead focused only upon the exertional demands.  Plaintiff argues that when the ALJ discussed plaintiff's past relevant work he did not discuss the non-exertional requirements of that work.

The ALJ discussed the requirements of plaintiff's past relevant work as it is performed in the national economy as follows:

> The evidence in this case establishes that the claimant has past relevant work as a home health nurse's aide.  The Dictionary of Occupational Titles list the strength demands of a home health aide (Home Attendant) as medium and the skill level at 3, which is semi-skilled.   The physical demands of that job, as described in the DOT, are frequent reaching, handling, talking, and hearing with only occasional stooping, crouching, fingering, feeling, and visual acuity.  It does not require climbing, balancing, kneeling, crawling, or tasting/smelling.  There is no exposure to high, exposed places (DOT. #354.377-014).

(Tr. 20).  The ALJ specifically discussed the above stated non-exertional functional limitations of plaintiff's past relevant work as a home health aide and determined that plaintiff had no limitation in those areas before he found plaintiff could return to her past relevant work as it is performed in the national economy. (Tr. 20).  Plaintiff presents no evidence that she has any functional limitation in any of these areas of function.  As previously stated, this court will not speculate as to which non-exertional functional limitations plaintiff believes result from her hypertension and hyperthyroidism such that would preclude her return to her past relevant work.

Accordingly, the undersigned finds that plaintiff's arguments are without merit.  The undersigned further finds that the ALJ did not err in finding plaintiff can perform the full range of medium work on a sustained basis and that his decision is supported by substantial evidence in the record.  Even though plaintiff has reported subjective symptoms resulting from her severe

impairments, the medical records and objective medical test results indicate that plaintiff has had negative cardiac evaluations including an assessment by a cardiologist (Tr. 189, 331, 343, 350, 352), two pulmonary function tests which showed only mild restriction, (Tr. 332, 344), testing for carpal tunnel syndrome which was negative (Tr. 402), and her hypertension and hyperthyroidism are controlled with medication. (Tr. 207-212; 333-338; 390-392).

**2. Whether the ALJ erred in finding that plaintiff's depression is not a severe impairment.**

Plaintiff argues that the ALJ erred when he found she did not have "any work related limitations resulting from a mental impairment" (Tr. 19) because this finding is not supported by evidence from any mental health professional.  Plaintiff points out that Dr. Tocci and Dr. Crum, the consultative psychologists, and Ellen Eno, Ph.D., the non-examining agency psychologist, all found plaintiff has depression which imposes significant non-exertional limitations.  Plaintiff points out that Dr. Smith, the psychiatrist, did not find plaintiff without mental impairment but instead found her impairment was less severe than did the other mental health professionals. Plaintiff also asserts that Dr. Smith's minority opinion is not supported by any diagnostic test results and is not corroborated by substantial evidence of record.  Thus, plaintiff argues that the ALJ committed reversible error by failing to find her depression was a severe impairment which resulted in mental functional limitations.

The ALJ discussed the psychological and psychiatric consultative reports. (Tr. 17-18). He discussed Dr. Crum's opinion and found

> that the results of the MMPI-2 indicate the claimant exaggerated her problems to
> Dr. Crum and as a result, finds the opinions of Dr. Crum, which resulted from this

> examination, lacking probative value.  The undersigned gives little weight to Dr.
> Crum's work related findings based upon the claimant's exaggeration.  The
> undersigned notes that Dr. Crum's findings with respect to the claimant's somatic
> complaints and exaggeration consistent with the report of the claimant's treating
> doctor, who reported that she had a list of complaints that was "very long" and
> her response was "positive for anything that you ask her."  The doctor wrote, "the
> list goes on."  Yet, the claimant's examination was unremarkable and her thyroid
> exam looked good.

(Tr. 19).  The ALJ also noted Dr. Smith's report that it was a "toss up" between adjustment

disorder and no diagnosis and that "[i]n any event, [plaintiff's] psychiatric impairments are not

grave." (Tr. 19).

The ALJ also discredited the opinion of Dr. Tocci that plaintiff has "major depression,

recurrent, moderate" and a current GAF of 50 and a past year GAF of 60 [6], because Dr. Tocci's

findings "were conflicting and confusing". (Tr. 19).  The ALJ referred to Dr. Tocci's report that

plaintiff showed some evidence of memory impairment and hallucinations but also found

plaintiff was cooperative, had good comprehension, normal social judgment, and "demonstrated

the ability to make informed personal and financial decision[s]." (Tr. 19).  He also noted that Dr.

Tocci found plaintiff was in mild distress. (Tr. 19).  The ALJ also referenced the treating

physician's report from December 11, 2002, wherein the physician found plaintiff had "a grossly

intact memory regarding both recent and remote.  She had a normal mood and affect and was

---

[6]  The Global Assessment of Functioning (GAF) Scale describes a clinician's judgment
regarding a person's overall psychological, social, and occupational functioning but does not
include any impairment of function caused by physical or environmental limitations.  Diagnostic
and Statistical Manual of Mental Disorders, American Psychiatric Association, 4th ed. Revised
2000.  A GAF score of 41-50 represents serious symptoms such as suicidal ideation, severe
obsessional rituals, or frequent shoplifting, or any serious impairment in social, occupational or
school functioning such as having no friends and the inability to keep a job. Id. at 32.  A GAF
score of 51-60 indicates moderate symptoms of mental illness or moderate difficulty in social,
occupational, or school functioning. Id. at 34.

'calm, alert and aware.'" (Tr. 19, 417).

The ALJ found plaintiff's allegations and testimony were not credible and that although she "testifies to many problems with her nerves such as shaking, sweating and bad dreams but does not buy her medications or seek social services to obtain her medications free." (Tr. 19). . (Tr. 19).  He then found that plaintiff has the residual functional capacity to perform the full range of medium work but had no other work related limitations. (Tr. 19).

The regulations state that "an impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a); 404.1521(a).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs.  Examples of these include-- (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting." 20 C.F.R. § 416.921(b); 404.1521(b).

Social Security Ruling 96-3p Titles II and XVI: Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment Is Severe,1996 WL 374181, sets forth that

> [t]o be found disabled, an individual must have a medically determinable "severe" physical or mental impairment or combination of impairments that meets the duration requirement. At step 2 of the sequential evaluation process, an impairment or combination of impairments is considered "severe" if it significantly limits an individual's physical or mental abilities to do basic work activities; an impairment(s) that is "not severe" must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities. (See SSR 85-28, "Titles II and XVI: Medical

26

impairments That Are Not Severe," C.E. 1981-1985, p. 394.)

Id. at *1.  The ruling also states that a "determination that an individual's impairment(s) is not

severe requires a careful evaluation of the medical findings that describe the impairment(s) (i.e.,

the objective medical evidence and any impairment- related symptoms), and an informed

judgment about the limitations and restrictions the impairment(s) and related symptom(s) impose

on the individual's physical and mental ability to do basic work activities." Id. at *2.

The Eleventh Circuit has held that a plaintiff's impairment may be considered "not

severe" only if it is a slight abnormality which has such a minimal effect on plaintiff that it is not

expected to interfere with the ability to work, regardless of age, education or work experience.

Brady v. Heckler, 724 F.2d 914, 922 (11th Cir. 1984).  In McDaniel v. Bowen, 800 F. 2d 1026

(11th Cir. 1986), the Eleventh Circuit clarified the severity determination and stated that

> [a]t step two of § 404.1520 and § 416.920 a claimant's impairment is determined
> to be either severe or not severe.  Step two is a threshold inquiry.  It allows only
> claims based on the most trivial impairments to be rejected.  The claimant's
> burden at step two is mild.  An impairment is not severe only if the abnormality is
> so slight and its effect so minimal that it would clearly not be expected to
> interfere with the individual's ability to work, irrespective of age, education or
> work experience.  Claimant need show only that her impairment is not so slight
> and its effect is not so minimal.

Id. at 1031.  Additionally, plaintiff must establish that the impairments cause a severe functional

limitation which continues for twelve consecutive months. See Barnhart v. Walton, 535 U. S.

212,122 S. Ct. 1265, 1272 (2002) ("For purposes of making that claim, Walton assumes what we

have just decided, namely, that the statute's '12 month' duration requirements apply to both the

'impairment' and the 'inability' to work requirements.").  Also, in Bridges v. Bowen, 815 F.2d

622 (11th Cir. 1987), the Court held that if an impairment causes only mild effects on plaintiff's

ability to work, or is amenable to medical treatment, it may be not severe. Id. at 625-626.

27

The undersigned is aware of the standard for a non-severe impairment as previously set forth in Brady, 724 F. 2d at 920. However, the undersigned also recognizes the standard for review, i.e., is there substantial evidence in the record to support the ALJ's finding. Substantial evidence which is defined as "more than a scintilla but less than a preponderance," consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson, 402 U.S. at 401, 91 S.Ct. at 1427; Bloodsworth, 703 F. 2d at 1239. The "reasonable person" standard dictates that if there is pertinent and adequate evidence supporting a decision, it must be upheld. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir.1990). Additionally, this Court may not substitute its own judgment for the Commissioner's nor re-evaluate the evidence unless the decision is clearly illogical and unsubstantiated. See Bloodsworth, 703 F.2d at 1239; see also Powell v. Heckler, 773 F.2d 1572, 1575 (11th Cir.1985). Therefore, even when evidence appears to weigh against the Commissioner's decision, this Court must affirm the decision if there is sufficient supporting evidence. Martin, 894 F.2d at 1529; see Bloodsworth, 703 F.2d at 1239 (11th Cir.1983).

Accordingly, the undersigned finds that the examination report from Dr. Smith wherein he found plaintiff's mental impairments were not grave and that no diagnosis of mental illness was a toss up with adjustment disorder,[7] combined with the absence of mental health counseling and the presence of only a prescription for an anti-depressant, constitute substantial evidence to support the ALJ's decision that plaintiff's depression is not a severe impairment. Other than

---

[7] Dr. Smith diagnosed an "adjustment disorder, chronic, relating to medical problems" and that "it is a toss up whether to offer adjustment disorder or no diagnosis. In any event, Ms. Davis' psychiatric impairments are not grave." (Tr. 431). Also, he completed a medical source opinion form wherein he found plaintiff was either mildly impaired or not impaired in all areas of basic mental work-related activities. (Tr. 432-433).

plaintiff's report of depression or anxiety and a physician's prescription for an anti-depressant medication, the only psychiatric or psychological evidence in the record consists of three one-time consultative examinations.  Plaintiff testified that she had not sought mental health treatment since her breakdown approximately fifteen years ago but for obtaining a prescription for an anti-depressant from her physician.[8]  Additionally, though not specifically addressed by the ALJ, Dr. Kemmerly, plaintiff's treating endocrinologist, indicated that plaintiff's anxiety should resolve as her thyroid condition resolved.[9]

Also, the ALJ set forth adequate and specific reasons for rejecting Dr. Tocci's opinion as internally inconsistent and Dr. Crum's opinion because it was based on plaintiff's somatic complaints and exaggerated responses as indicated by her treating physician's report that plaintiff's responses were "positive for anything that you ask her"despite her unremarkable examinations.[10] See Bloodsworth, 703 F.2d at 1240 citing Oldham v. Schweiker, 660 F.2d 1078,

---

[8]  On May 3, 2000, plaintiff was treated at Jackson Medical Center by a nurse practitioner.  Among her diagnoses were tension, anxiety, and depression and an anti-depressant medication was prescribed. (Tr. 223).

[9]  On March 29, 2002, Dr. Kemmerly noted plaintiff's symptoms had not changed much and that plaintiff asked for something for nervousness.  She adjusted plaintiff's medications and added Paxil, an anti-depressant. Dr. Kemmerly also noted that the anxiety was probably due to the hyperthyroidism. (Tr. 337).

[10]  On March 9, 2003, plaintiff returned to Dr. Kemmerly for follow-up of her thyroid and noted plaintiff was "doing good". (Tr. 390).  Dr. Kemmerly noted

> She has a list of complaints today that is very long.
> 1. Sore throat.
> 2. Ear pain.
> 3. Nausea and vomiting occasionally.
> 4. Finger numbness.
> 5. Pain in her jaw.
> 6. Dizzy. The list goes on.
> She pretty much has a completely positive review of systems for

1084 (5th Cir. Unit B 1981) ("Further, the Secretary may reject the opinion of any physician when the evidence supports a contrary conclusion.").

Further, in view of the foregoing, the undersigned finds that the ALJ did not err by relying upon the opinion of the examining psychiatrist Dr. Smith instead of the opinion of the non-examining agency psychologist Dr. Eno. See Spencer on behalf of Spencer v. Heckler, 765 F.2d 1090, 1093-94 (11th Cir.1985) (per curiam) ("[T]he reports of physicians who did not examine the claimant, taken alone, do not constitute substantial evidence on which to base an administrative decision."); see also Swindle v. Sullivan, 914 F.2d 222, 226 n. 3 (11th Cir.1990) (citing Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir.1985) (The opinion of a non-examining agency physician "is entitled to little weight and taken alone does not constitute substantial evidence to support an administrative decision.").  Importantly, Dr. Eno completed the psychiatric review technique form on February 11, 2003, at which time Dr. Tocci's mental health consultation report was the only such report in evidence for Dr. Eno to review. (Tr. 363, 372).

Accordingly, the undersigned finds that the ALJ did not commit reversible error by failing to find plaintiff's depression was a severe impairment and that substantial evidence supports the ALJ's decision.

**3.  Whether the ALJ erred in failing to properly consider plaintiff's testimony of chest pain, shortness of breath, dizziness, and fatigue.**

---

anything that you ask her. (Tr. 390).

Plaintiff argues that her testimony regarding these subjective symptoms is supported by substantial medical and diagnostic evidence in the record and that the ALJ erred by failing to find her testimony credible.  Plaintiff argues that her treating physicians' consistent documentation of her subjective complaints of chest pain, shortness of breath, dizziness,  fatigue, and spots before her eyes are clearly correlated to her diagnosis of Graves' Disease and hyperthyroidism.  Plaintiff also argues that the medical findings of cardiomegaly (Tr. 164, 326, 329), mild congestive heart failure (Tr. 164), mild pulmonary function restrictions (Tr. 325, 331), hyperthyroidism symptoms (Tr. 333-339), and the findings of the cardiologist (Tr. 341) support her subjective complaints.  Plaintiff argues that the ALJ "simply failed to make appropriate findings" and that he did not properly evaluate her symptoms. (Doc.11, p. 17).

The ALJ summarized plaintiff's medical records and after stating that he must consider all of plaintiff's symptoms according to 20 C.F.R. § 404.1529, discussed her testimony and the results of her psychiatric and psychological evaluations. (Tr. 17-19).  After which he noted plaintiff testified that she takes medication for high blood pressure and hyperthyroidism, reported she could not afford other prescribed medications, and controlled her body pains with over-the- counter aspirin. (Tr. 19).  He then found as follows:

> The undersigned has carefully considered the claimant's allegations and her testimony and finds that she is not credible.  Her treating doctors have noted her many problems and have found her with unremarkable examinations.

(Tr. 19).

When a plaintiff alleges disability based upon subjective complaints of symptoms, those subjective complaints are evaluated under the pain standard which states that "[i]n order to establish disability based on testimony of pain and other symptoms, the claimant must satisfy

31

two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." Wilson v. Barnhart, 284 F.3d 1219, 1225-1226 (11th Cir. 2002); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir.1991); Landry v. Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986). Subjective testimony regarding symptoms if supported by objective medical evidence which satisfies the pain standard is sufficient to support a finding of disability. See Brown v. Sullivan, 921 F.2d 1222, 1236 (11th Cir. 1991). "After considering a claimant's complaints of pain, the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence." Marbury v. Sullivan, 957 F. 2d 837, 839 (11th Cir. 1992). If the ALJ discredits plaintiff's subjective testimony, he must clearly articulate adequate and specific reasons, Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995), or, if he implicitly discredits plaintiff's subjective testimony, it must be clear from review of the record and the ALJ's decision. Tienieber v. Heckler, 720 F.2d 1251, 1255 (11th Cir.1983). "Although this circuit does not require an explicit finding as to credibility, ... the implication must be obvious to the reviewing court." Id. at 1255. Also, the reasons set forth must be based on substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir.1991); see Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir.1987); see also Allen v. Sullivan, 880 F.2d 1200, 1202-1203 (11th Cir. 1989) (citing Walker v. Bowen, 826 F.2d 996, 1002-03 (11th Cir.1987). Also, "[f]ailure to articulate the reasons for discrediting subjective pain testimony, requires as a matter of law, that the testimony be accepted as true." Brown, 921 F.2d at 1236; see also Hale, 831 F. 2d at 1012.

When making a credibility determination, the ALJ may consider treatment and

medication taken to relieve or control symptoms. 20 C.F.R. § 404.1529(c)(3)( The ALJ may consider  "(iv) [t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; [and] (v) [t]reatment, other than medication, you receive or have received for relief of your pain or other symptoms").

Moreover, "[t]he credibility of witnesses is for the [Commissioner] to determine, not the courts." Carnes v. Sullivan, 936 F.2d 1215, 1219 (11th Cir. 1991) citing Kelly v. Heckler, 736 F.2d 631, 632 (11th Cir.1984).  Additionally, the ALJ's "task is to examine the evidence and resolve conflicting reports." Wolfe v. Chater, 86 F.3d 1072, 1079 (11th Cir. 1996) citing Powers v. Heckler, 738 F.2d 1151, 1152 (11th Cir.1984) (per curiam); Grant v. Richardson, 445 F.2d 656 (5th Cir.1971) (per curiam) ("Moreover, the resolution of any conflict in the evidence, including conflicting medical opinions, as in the case at hand, and the determination of questions of credibility of the witnesses are not for the court; such functions are solely within the province of the Secretary."); 20 C.F.R. § 404.1546, 20 C.F.R. § 416.946.

The undersigned finds that the medical records constitute substantial evidence to support the ALJ's determination and that the ALJ did not err in his analysis of plaintiff's subjective complaints and his decision that she was not credible to the extent alleged.  As support for her argument, plaintiff points to several diagnostic test results and medical findings in the medical evidence.  Specifically, plaintiff points to cardiac evaluations which indicated congestive failure and cardiomegaly as support for her subjective complaints.  She also referenced an evaluation performed by a doctor at Cardiology Associates on December 19, 2002, wherein the doctor found shortness of breath, chest pain and fatigue. (Tr. 341).  However, review of the record shows that it is unclear whether plaintiff refers to the doctor's recording of her report of these

symptoms as opposed to the cardiologist's observation or finding of these symptoms.  The

cardiologist's report on physical examination shows plaintiff's lungs were clear bilaterally and

she had no abnormal heart sounds, no bruits in her arteries, normal pedal pulses, and no edema

or varicosities. (Tr. 341).  There are no further records from the cardiologist.  Plaintiff's

cardiologist ordered additional tests, including a echocardiogram which was interpreted as

follows:

> 1. Normal left ventricular size and function with a left ventricular ejection
> fraction of approximately 55% with an area of possible hypokinesis of the inferior
> wall. Clinical correlation is recommended.
> 2. Mild biatrial enlargement.
> 3. Mild to moderate mitral regurgitation.
> 4. Trace tricuspid regurgitation with a normal estimated RV systolic pressure of
> 20 mm. of mercury.

(Tr. 352).  Also, plaintiff's cardiolite stress test was interpreted as follows:

> 1. Left ventricular ejection fraction of 67% - - excellent wall motion.
> 2. No obvious reversible ischemia is noted.
> 3. Subtle anterior attenuation that is most likely due to breast artifact.

(Tr. 350).  There are no further records from the cardiologist.

Plaintiff references her diagnosis with mild pulmonary restriction as support for her

complaints of shortness of breath and fatigue.  On December 26, 2002, on referral from the

cardiologist, Dr. Shulte, a pulmonologist, examined plaintiff and performed pulmonary function

tests.  Dr. Shulte found mild restriction but did not place any functional restriction upon plaintiff

but instead recommended that she exercise and regain her conditioning. (Tr. 344).  He also noted

that plaintiff "has had a negative cardiac evaluation" and a negative stress test. (Tr. 343).

Plaintiff also refers to the treatment records from Dr. Kemmerly who began treating

plaintiff for hyperthyroidism in November 2001 as support for her complaints. (Tr. 189).  After

34

treating plaintiff with medication to alleviate her symptoms, in April 2002, Dr. Kemmerly changed her treatment and arranged for radiation therapy for plaintiff's thyroid gland. (Tr. 333, 337-338).  Plaintiff continued to report symptoms related to her thyroid condition primarily fatigue, and Dr. Kemmerly continued to adjust plaintiff's medications. (Tr. 336).  Almost a year after radiation therapy and following adjustments to her Synthroid, in March 2003, plaintiff returned for a follow-up and Dr. Kemmerly noted plaintiff was "doing good" despite a list of complaints. (Tr. 390).  On physical examination, Dr. Kemmerly found only an inflamed right ear and noted plaintiff's chest was clear, heart was regular, and she had no tremors and normal deep tendon reflexes in her extremities. (Tr. 390).

As previously stated, the standard for review requires a determination as to whether there is substantial evidence, i.e., "more than a scintilla but less than a preponderance," in the record to support the ALJ's finding. Richardson, 402 U.S. at 401, 91 S.Ct. at 1427;  Bloodsworth, 703 F. 2d at 1239.  Also, as previously stated, substantial evidence consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Id.  Importantly, the undersigned may not substitute her own judgment for the Commissioner's nor re-evaluate the evidence unless the decision is clearly illogical and unsubstantiated, which plaintiff seeks this court to do by re-evaluating medical tests after plaintiff's doctors have indicated that such testing rendered negative findings. See Bloodsworth, 703 F.2d at 1239.  The undersigned finds that plaintiff's clinical treatment records and diagnostic test results support the ALJ's finding that plaintiff's medical records were unremarkable and thus did not support her allegations of subjective complaints.

Plaintiff also argues that the ALJ did not make a finding as to whether she has a

medically determinable impairment which could reasonably be expected to produce her

subjective symptoms of chest pain, shortness of breath, dizziness and fatigue.  However, the

undersigned finds this argument without support.  Plaintiff acknowledges that the ALJ found that

she has the severe impairments of hypertension and hyperthyroidism. (Doc. 11).  In her argument

in support of the first issue, plaintiff specifically states that the ALJ found she has the severe

impairments of hypertension and hyperthyroidism.

> In his decision, the ALJ stated that
>
> in making his residual functional capacity assessment, the undersigned must
> consider all symptoms, including pain, and the extent to which these symptoms
> can reasonably be accepted as consistent with the objective medical and other
> evidence based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929, and
> Social Security Ruling 96-7p.

(Tr. 18).  These regulations set forth the requirements for evaluating pain and other subjective

symptoms.  Ruling 96-7p, entitled Social Security Ruling 96-7p: <u>Titles II and XVI: Evaluation of

Symptoms in Disability Claims: Assessing The Credibility of an Individual's Statements</u>, 1996

WL 374186, sets forth the requirements for determining the credibility of a plaintiff's allegations

of pain and subjective symptoms.

Arguably, the ALJ could have made a more direct correlation between the elements

contained in 20 C.F.R. § 404.1529 and the medical and other evidence in the record upon which

he relied in making his credibility determination.  However, the ALJ did make a finding of a

medically determinable impairment, *i.e.*, hypertension and hyperthyroidism, which could

reasonably be expected to produce plaintiff's symptoms,  analyzed the medical evidence in terms

of plaintiff's subjective complaints, and reached a determination that her allegations were not

fully credible which is supported by substantial evidence in the record.  Accordingly, the

undersigned finds that the ALJ did not commit reversible error on this issue.

**4. Whether the ALJ erred in failing to find that plaintiff suffers from the severe impairment of obesity.**

Plaintiff argues that because she is morbidly obese[11] it is reasonable to assume that her morbid obesity contributes significantly to the shortness of breath and fatigue which result from her severe impairments of hypertension and hyperthyroidism.  Plaintiff relies upon Social Security Ruling 02-01p: Titles II and XVI: <u>Evaluation of Obesity</u>, 2000 WL 628049, and Social Security Ruling 00-3p: <u>Titles II and XVI: Evaluation of Obesity,</u> 2000 WL 33952015.  Plaintiff argues that the ALJ did not mention or consider obesity in his decision and that pursuant to the Rulings, he should have found her obesity was a medically determinable impairment at the second step of the sequential evaluation process and considered its affect on her residual functional ability in the remaining steps.

In regard to determining when obesity is a severe impairment, Social Security Ruling 02-01p, sets forth as follows:

> As with any other medical condition, we will find that obesity is a "severe" impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities.  . . .   We will also consider the effects of any symptoms (such as pain or fatigue) that could limit functioning. (Citations omitted)  Therefore, we will find that an impairment(s) is "not severe" only if it is a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the individual's ability to do basic work activities[.]

<u>Id.</u> at *4.

---

[11] Plaintiff points out that her highest weight of 243 pounds with a height of 5'4" produces a body mass index of 41.71 indicating morbid obesity and that her lowest weight of 205 pounds with a height of 5'4" produces a body mass index of 35.18 indicating Level II obesity.  (Doc. 11, p. 22).

As previously discussed, the regulations state that "an impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a); 404.1521(a).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs.  Examples of these include-- (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting. 20 C.F.R. § 416.921(b); 404.1521(b).

Obesity, as any impairment, may only be considered "not severe" if it is a slight abnormality which has such a minimal effect on plaintiff that it is not expected to interfere with the ability to work, regardless of age, education or work experience.  Brady, 724 F.2d at 922. Also, Social Security Ruling 00-3p sets forth that obesity will be considered a severe impairment "when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." Id. at *4.   The ruling also states that an impairment is not severe "only if it is a slight abnormality . . . that has no more than a minimal effect on the individual's ability to do basic work activities." Id.

As an initial consideration, plaintiff did not allege that she was disabled because of obesity. (Tr. 85, 291).  She has not reported any functional limitation of her ability to perform

exertional or mental basic work activities resulting from her obesity.[12]  Prior to her application in November 2001, plaintiff's weight was noted as 236 pounds in May 2000. (Tr. 223).  Thus, she has been aware of her obesity at least since that time and could have included it among her disabling conditions, or reported the functional limitations caused by her obesity, or testified that her obesity contributed to her other medically diagnosed conditions.

Importantly, an effect upon or inability to perform basic work activities should not be assumed because a person is morbidly obese.  To assume that plaintiff's obesity is a severe impairment simply because she is obese does not comport with the intent of the regulations or rulings that address obesity or with the method for determining whether a plaintiff's medical condition is a severe impairment.  Ruling 02-01p states

> [t]here is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment. Neither do descriptive terms for levels of obesity (e.g., 'severe,' 'extreme,' or 'morbid' obesity) establish whether obesity is or is not a 'severe' impairment for disability program purposes. Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe.

Id. at *4.

Arguably, based upon the record, a finding that plaintiff was obese could have been made.  However, the inquiry under the Ruling is not whether plaintiff was obese but whether obesity contributed to functional, exertional or mental limitations such that would render her obesity a severe impairment.  In that regard, plaintiff has not offered any evidence that her

---

[12]  Plaintiff testified that she took Paxil for her nerves but has not been able to afford it since losing her Medicaid. (Tr. 44).  She testified that she shakes, sweats and has bad dreams but the medication calms her. (Tr. 44).  Her nerves affect her ability to work because she cries "mostly everyday" for ten or fifteen minutes or more. (Tr. 44).  If she is stressed she will wake up and start crying. (Tr. 44).

mental or physical functional limitations result from or were affected by her obesity and she has

not pointed to any evidence in the record where a medical doctor or other medical source placed

a functional or mental limitation upon plaintiff's ability to perform basic work activities because

of her weight.[13]   While the ALJ has a duty to develop the record and is bound to make every

reasonable effort to obtain all the medical evidence necessary to make a determination, 20 C.F.R.

§§ 416.912(d), 404.1512(d), the ALJ is not charged with making plaintiff's case for her.  She has

the burden of proving she is disabled.  See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th

Cir.1987)); Bloodsworth, 703 F.2d at 1240.  The regulations provide in part:

> In general, you have to prove to us that you are blind or disabled. Therefore, you
> must bring to our attention everything that shows that you are blind or disabled.
> This means you must furnish medical and other evidence that we can use to reach
> conclusions about your impairment(s) and, if material to the determination of
> whether you are blind or disabled, its effect on your ability to work on a sustained

---

[13]  On  November 13, 2002,  Dr. Gewin found as follows:

> I have viewed her chest x-ray.  I discussed the situation with her.  I think a lot of
> her shortness of breath is probably related to her weight.  She did not have any
> evidence of airways obstruction, but this may be because asthma tends to be
> intermittent.  I will treat her aggressively for asthma with Singulair, Advair and
> Albuterol. I will have her return to see me in three weeks.  If she continues to
> have problems, I will refer her for complete pulmonary functions at the Mobile
> Infirmary.

(Tr. 332).  On December 26, 2002, Dr. Shulte, a pulmonologist, noted plaintiff's weight at 243
pounds, and that he

> told Ms. Davis she needed to lose weight and begin exercising in order to regain
> her condition and also recheck with her cardiologist for hypertension.

(Tr. 344).   Dr. Shulte also noted that plaintiff had had a negative cardiac evaluation. (Tr. 344).

Neither Dr. Gewin nor Dr. Shulte placed any functional limitation upon plaintiff, but to
the contrary, Dr. Shulte, the pulmonologist told her to "begin exercising in order to regain her
condition." (Id.)

basis.

20 C.F.R. §§ 416.912(a), 404.1512(a). "In making a claim for Social Security disability benefits,

a claimant bears the initial burden of establishing the existence of a disability." <u>Lucas v.</u>

<u>Sullivan</u>, 918 F.2d 1567, 1571 (11th Cir. 1990) (citing [Social Security Act § 1614(a)(3)] 42

U.S.C. § 1382c(a)(3) (1982); <u>see</u> 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1529, 416.929.

Accordingly, the undersigned finds that the ALJ's failure to identify plaintiff's obesity as a

severe impairment was not reversible error and that the ALJ did not err by failing to evaluate

whether plaintiff's obesity created any functional limitations in combination with plaintiff's

severe impairments of hypertension and hyperthyroidism.

**VIII.   <u>Conclusion</u>**

For the reasons set forth, and upon consideration of the administrative record and the

memoranda of the parties, the decision of the Commissioner of Social Security denying

plaintiff's claim for Social Security disability insurance benefits and supplemental security

income is **AFFIRMED.**

**DONE** this 15th day of December, 2005.

<u>**s / Kristi K. DuBose**</u>
**KRISTI K. DuBOSE**
**UNITED STATES MAGISTRATE JUDGE**